[No. A026441. First Dist., Div. Four. Feb. 27, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY ALLEN McCASLIN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II C.

2

**COUNSEL**

William T. Lowe, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Linda Ludlow and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHANNELL, J.**—Following a jury trial, appellant Ricky Allen McCaslin was convicted of felony escape in violation of Penal Code section 4532, subdivision (b).[1] After further jury proceedings, appellant was found sane at the time of the offense. Outside the presence of the jury, appellant admitted three prior felony convictions. He was sentenced to serve two years in state prison, consecutive to another sentence being served, with 16 months of his sentence ordered stayed pending appeal. Two additional years were imposed for two of the prior prison terms, with these two years also ordered stayed pending appeal and service of sentence in other actions. A timely notice of appeal was filed.

Appellant contends: (1) an intrajail mail letter was improperly admitted into evidence; (2) the jury was erroneously instructed on the law of insanity;

---

[1]Unless otherwise indicated, all section references are to the Penal Code.

and (3) the trial court erroneously restricted defense testimony during the sanity phase. We affirm the judgment.

## I. FACTS

The facts underlying the offense may be simply stated. On February 1, 1983, appellant was in lawful custody of the Contra Costa County Sheriff's Department, having been charged with a felony. On that date, appellant was one of seven prisoners being transported from the main detention facility to the superior court while handcuffed and attached to a chain with the other prisoners. As they approached the courthouse holding cell, appellant suddenly broke free, fled from the building, and succeeded in running approximately a quarter mile before being caught by two off-duty policemen and two sheriff's deputies. A pat-search revealed a handcuff key in appellant's pocket.

Following his capture, appellant was placed in "D" module of the jail facility, consisting of individual cells that preclude mixing with the general jail population. The next day, a letter sent by appellant through the intrajail mail system to another inmate was intercepted by jail authorities. The letter read, in part: "[H]ey, son, no doubt you have heard what happened by now. Yep, two different people said they'd be, but there I was, out of wind and my legs are feeling like they would fold on me when the Martinez Police caught me. Couldn't find a ride anywhere. The only thing in cars were police. But I sure did give them a run."

## II. DISCUSSION

### A. *Interception of Intrajail Mail*

Prior to trial, a hearing was held to determine the admissibility of the letter sent by appellant to another inmate that was intercepted while in the intrajail mail system. A jail classification deputy testified concerning the handling of inmate mail. Outgoing U.S. mail is neither opened nor read. Incoming U.S. mail is opened and inspected for contraband or monetary items, but normally the contents are not read. On the other hand, intrajail mail sent between inmates is read, at least in a cursory manner, by the custody sergeant or his designee. This is done to discover any threats that might be made to an inmate, "snitch jackets" placed on other inmates, and to detect coordination of possible escape attempts between inmates in custody. Thus, the general reason for reviewing intrajail mail is "jail security." These policies and procedures on inmate mail are in writing, and copies are posted in each module. In addition, these policies are explained in a videotape shown to each inmate when first brought into the jail.

Concerning the letter in issue, it was brought to the attention of the classification deputy because appellant had escaped the day before and the letter contained references to the possibility of outside assistance. This type of information is used by the classification deputy to determine the degree of security measures necessary for an inmate, including the module assignment inside the facility and the nature of restraints used when outside the facility.

At the end of the hearing, the trial court denied appellant's motion to suppress the contents of the letter as there was no expectation of privacy, fair warning was given concerning mail procedures, and the procedures were not carried out surreptitiously. The letter was seized during a routine procedure established for security purposes in the institution. The trial court concluded there was no denial of any of appellant's constitutional rights.

Appellant relies on *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 867 [183 Cal.Rptr. 866, 647 P.2d 142], a civil class action suit in which the plaintiff sought injunctive and declaratory relief challenging county jail surveillance practices. The narrow question in *De Lancie* was whether county jail officials may monitor ostensibly private conversations between pre-trial detainees and their visitors for the purpose of discovering evidence for use in criminal trials, rather than for the purpose of institutional security or public protection. (*Id.*, at pp. 867-868.) Relying solely on statutory grounds (*id.*, at p. 877), the Supreme Court explained that by enactment of sections 2600 and 2601, the Legislature established a policy that prisoners retain the rights of free persons, including the right of privacy, "except to the extent that restrictions are necessary to insure the security of the prison and the protection of the public." (*Id.*, at p. 868.) In *De Lancie,* it was held that insofar as the plaintiff's complaint alleged that the monitoring of conversations involving county jail detainees was not undertaken for security purposes, but rather was utilized primarily to gather evidence for use in criminal trials, a cause of action was stated under sections 2600 and 2601. (*Id.*, at p. 877.)[2]

The Attorney General states that the premise underlying appellant's contention is his entitlement to the protection of the Fourth Amendment against unreasonable searches and seizures. Noting that this case arose after the adoption of Proposition 8, the Attorney General argues that federal law governs the admission of evidence of this case. (*In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].) He submits that to the extent the analysis in *De Lancie,* interpreting section 2600 and possibly

---

[2]We note that when denying the motion to suppress the letter, the trial court did suppress a monitored jailhouse conversation, relying on *De Lancie*.

ordering the suppression of evidence, is inconsistent with the United States Supreme Court's analysis under the Fourth Amendment, that *De Lancie* is no longer controlling under the California Constitution.

 We believe that all of these authorities are reconcilable, that procedurally, *De Lancie* does not apply to this case, and that under controlling federal precedents, appellant's letter was properly admitted into evidence.

First, we are aware of no published case which relies upon *De Lancie* as authority to suppress evidence obtained through an unreasonable search of a prison or county jail inmate. (See *People* v. *West* (1985) 170 Cal.App.3d 326, 330 [216 Cal.Rptr. 195].) It was a civil proceeding in which injunctive and declaratory relief was sought. Further, as we noted above, *De Lancie* explicitly relied solely upon state statutory grounds. (*De Lancie* v. *Superior Court, supra,* 31 Cal.3d at p. 877.) Proposition 8 eliminated the judicially created exclusionary rule as a remedy for violations of search and seizure provisions of the federal or state Constitution, through the exclusion of evidence obtained, except to the extent that exclusion remains federally compelled. (*In re Lance W., supra,* 37 Cal.3d at pp. 886-887; *People* v. *West, supra,* 170 Cal.App.3d at pp. 330-331.) "Although *De Lancie* relied on two Penal Code sections in its analysis, those sections do not authorize specifically the exclusion of evidence. They merely delineate the rights retained by individuals who are imprisoned. Consequently, the exclusion of evidence obtained through an unlawful search of a prison inmate is governed by federal precedent." (*Id.,* at p. 331.)

 In *Hudson* v. *Palmer* (1984) 468 U.S. 517 [82 L.Ed.2d 393, 104 S.Ct. 3194], the United States Supreme Court held that the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." (*Id.,* at pp. 527-528 [82 L.Ed.2d at p. 404], fn. omitted; see also *People* v. *Garvey* (1979) 99 Cal.App.3d 320, 323 [160 Cal.Rptr. 73].)

With regard to *pretrial* detainees, the Supreme Court has expressed concern as to whether a particular restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" (*Bell* v. *Wolfish* (1979) 441

U.S. 520, 539 [60 L.Ed.2d 447, 468, 99 S.Ct. 1861].) There is "no dispute that internal security of detention facilities is a legitimate governmental interest, . . ." (*Block* v. *Rutherford* (1984) 468 U.S. 576, 586 [82 L.Ed.2d 438, 447, 104 S.Ct. 3227].)

■ Notwithstanding First Amendment considerations, the imposition of certain restraints on inmate correspondence is justified if two criteria are met: "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." (*Procunier* v. *Martinez* (1974) 416 U.S. 396, 413 [40 L.Ed.2d 224, 240, 94 S.Ct. 139].) "Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison." (*Ibid.*)

■ In our case, contrary to appellant's assertions, the policies and procedures relating to the handling of intrajail mail were established for the purpose of preserving jail security. Any expectation of privacy in traditional Fourth Amendment terms must yield to this legitimate governmental interest. Further, these policies and procedures were in writing and efforts were made through informational videotapes and posted notices to notify jail inmates of them. (See *People* v. *Garvey, supra,* 99 Cal.App.3d at pp. 325, 329 [dis. opn. of Poché, J.].) Outgoing letters transmitted through the U.S. mail remained unopened, and incoming mail normally was opened and inspected only for contraband or monetary items. Only intrajail mail was routinely reviewed as to contents. We believe this limitation of the First Amendment rights of appellant and his addressees was no greater than necessary or essential to the protection of the substantial governmental interest involved, namely, preserving jail security. (See *Procunier* v. *Martinez, supra,* 416 U.S. at pp. 413-414 [40 L.Ed.2d at p. 240].) Particularly when applied to appellant, who had just the day before escaped, constitutional or statutory rights were not violated when jail authorities intercepted and read his intrajail letter. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 81 [222 Cal.Rptr. 127, 711 P.2d 423] [inspection of jail mail pursuant to authorizing regulations held reasonable under Fourth Amendment if prisoner is dangerous or an escape risk]; see also *United States* v. *Vallez* (9th Cir. 1981) 653 F.2d 403, 406 [examination of contents of inmate's letter admissible where officer suspected letter might contain escape plans]; *Conklin* v. *Hancock* (D.N.H. 1971) 334 F.Supp. 1119, 1122-1123 [examination of pretrial detainee's incoming and outgoing mail for escape plans permissible in light of past record of escape attempts].)

B. *Instructions on Insanity*

Appellant contends the trial court erroneously instructed the jury on the law of insanity in that: (1) it improperly used the conjunctive rather than disjunctive in stating the two prongs of the M'Naghten test for insanity, and (2) it required proof of a "mental disease or defect" to establish insanity. Appellant is correct as to the first of his two contentions. We find, however, that he was not prejudiced by the error.

■ In support of his first argument, appellant argues it is clear from a review of section 25, subdivision (b), its history, and the history of the insanity test in California that "the purpose of Proposition 8 in 1982, whereby [section 25] was enacted, was to reinstate the *M'Naghten* test after its abandonment by the Supreme Court in *People* v. *Drew* (1978) 22 Cal.3d 333. . . ." In *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752], decided after this case was briefed, the Supreme Court, too, concluded "that section 25(b) was intended to, and does, restore the M'Naghten test as it existed in this state before *Drew.*" (*Id.*, at p. 769.) It therefore construed the conjunctive "and" as if it read in the disjunctive, "or," and held that the existence of either of the two prongs of the M'Naghten test was sufficient to establish legal insanity. (*Id.*, at pp. 769, 776-777.) The trial court in this case therefore erred in this portion of its insanity instructions.

■ By the same reasoning, however, the trial court correctly instructed that such legal insanity must be "by reason of mental disease or defect."[3] The trial court's instructions on the defense of insanity were in accord with CALJIC No. 4.00 (1982 rev.). The CALJIC committee recognized that the phrase, "by reason of mental disease or mental defect" does not appear in section 25, subdivision (b). The words were included in the recommended instruction by the CALJIC committee, however, because the committee, too, correctly understood that section 25 was intended to "reinstate the defense of insanity to the status which existed prior to Drew. The law, as it existed prior to Drew, used the term 'by reason of mental disease or mental defect.'" (CALJIC No. 4.00—comment.)

To hold otherwise would have the effect of recognizing an "antisocial personality" as a form of insanity, something which our Supreme Court refused to do even under *Drew*. (*People* v. *Fields* (1983) 35 Cal.3d 329, 368-372 [197 Cal.Rptr. 803, 673 P.2d 680].) "Indeed, the 'antisocial per-

---

[3]Appellant argues, inconsistently, that while Proposition 8 tightened the law by reverting to the M'Naghten test of insanity, "the law was 'liberalized' by deleting the requirement that a discernible mental disease or defect be the root cause of the problem."

sonality' is the classic criminal; our prisons are largely populated by such persons. To classify such persons as insane would radically revise the criminal law—insanity, instead of a rare exception to the rule of criminal accountability, would become the ordinary defense in a felony trial." (*Id.*, at p. 372.)

That is precisely what occurred in this case. Appellant has spent most of his adult life in prison. While he offered lay testimony relating to certain personal pressures arising from the effects of incarceration, family illnesses and a lost love, no expert evidence was presented in his behalf. Dr. Charles Noonan, a court-appointed psychiatrist, testified for the prosecution that he found no evidence of mental disease or defect. Instead, he diagnosed appellant as having an antisocial personality disorder. In *Fields*, the Supreme Court indicated that the policy considerations discussed in that opinion for barring extension of the insanity defense to such persons applied with equal force to cases arising under Proposition 8. (*People* v. *Fields, supra,* 35 Cal.3d at p. 368, fn. 19.) We therefore find no error in that portion of the insanity instruction requiring the existence of a mental disease or a mental defect.

 Concerning the error that was committed, there is no indication in this record that appellant would have received a more favorable determination of insanity had the jury been instructed in accord with *People* v. *Skinner, supra,* 39 Cal.3d 765. Any error, therefore, was not prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

C. *Exclusion of Evidence During the Sanity Phase**

. . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Anderson, P. J., and Sabraw, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 21, 1986.

---

*See footnote, page 1, *ante.*